Estate of Sam E. Broadhead (Deceased), S. Norris Broadhead and Paul E. Broadhead, Executors, and Virdie Cox Broadhead, et al. [1] v. Commissioner. Estate of Broadhead v. Commissioner
Docket Nos. 5127-65, 1836-66, 728-68, 1340-68.
United States Tax Court
T.C. Memo 1972-195; 1972 Tax Ct. Memo LEXIS 61; 31 T.C.M. (CCH) 951; T.C.M. (RIA) 72195; September 7, 1972
deQuincy V. Sutton, Lamar Hotel, Meridian, Miss., for the petitioners. James D. Burroughs and Joel Gerber, for the respondent. *63 DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: The trial of these cases was held in Tuscaloosa and Birmingham, Alabama, before Commissioner James M. Gussis of this Court. His report, which contains findings of fact, was submitted to the Chief Judge. With relatively minor variations we have adopted the findings of fact made by the trial commissioner and they are set forth below. Respondent determined deficiencies in the petitioners' Federal income tax and additions to tax for the years 1961 through 1965 as follows: Docket
Income Tax
Additions
Petitioners
No.
Year
Deficiency
to Tax
Estate of Sam E. Broadhead, Deceased, S. N0ORRIS Broadhead and Paul E. Broadhead, Executors, and Virdie Cox Broadhead
5127-65
1961
$222,249.73
1836-66
1962
2,952.48
[2] $ 442.87
1963
228,145.73
[2] 57,036.43
1340-68
1964
209,846.81
[3] 10,492.34
1965
1,913.17
[2] 468.80
Paul E. and Sherry Broadhead
728-68
1965
595.33
[3] 29.77
*64 In docket No. 5127-65 the respondent in an amendment to his answer filed on January 15, 1969, claimed an additional deficiency in petitioners' Federal income tax for 1961 in the amount of $795,579.49 (or a total deficiency in income tax for that year in the amount of $1,017,829.22). The remaining issues in docket Nos. 5127-65, 1836-66 and 1340-68 are: (1) Whether petitioners realized a gain of $1,205,564.76 from the sale in 1961 to Ark Investments, Inc., of (a) the Togo Island property, (b) certain timberland in Arkansas, and (c) certain timber rights known as the 953 Pickthorn Lease; (2) whether petitioners are entitled to elect to report on the installment method any gain realized by them on the sale of property to Ark Investment, Inc., in 1961; (3) whether petitioners may revoke an election made by them in 1965 to utilize the provisions of section 1038 of the Code; (4) whether the gains realized by petitioners from the sales of property in 1961 and 1963 are taxable as ordinary income or as long-term capital gains; (5) whether $468,930.01 received by petitioners in 1963 resulting from their assignment of an installment note plus accrued interest constituted a sale or disposition *65 under the provisions of section 453(d) of the Code; (6) whether petitioners are entitled to a deduction for certain business losses in the amount of $528,170 in the year 1964; (7) determination of the correct basis to be used in computing gain on the sale of the Avoyelles tract, the Togo Island (Louisiana) property and the Sturgis property in 1963; (8) whether petitioners are liable for the addition to tax in the year 1964 under section 6653(a) of the Code; (9) whether petitioners understated their capital gains for the year 1964 in the amount of $11,761.62; (10) whether petitioners are entitled to deduct in 1965 the amount of $6,813.74 paid to creditors of Broadhead Drilling Company; and (11) whether petitioners are liable for additions to tax in 1965 under section 6651(a) of the Code. The only remaining issue in docket No. 728-68 is whether petitioners are liable for additions to tax in 1965 under section 6651(a). It has been stipulated in docket No. 1836-66 that there are no deficiencies in petitioners' income tax for the year 1962 and that petitioners did not incur any net operating loss in that year. Respondent has conceded that the petitioners in docket No. 1836-66 are not *66 liable for additions to tax in the year 1963 under section 6651(a). Additional concessions made by the parties can be given effect in the Rule 50 computations. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto, as well as the supplemental stipulation of facts, are incorporated herein by this reference. In addition, the facts in the related cases, docket Nos. 844-68 and 3710-69, have been considered by the Court. During the taxable years involved herein and prior to Sam E. Broadhead's death on February 6, 1965, he and his wife Virdie Cox Broadhead were residents of Meridian, Mississippi. S. Norris Broadhead and Paul E. Broadhead are eexcutors of the Estate of Sam E. Broadhead, and at the time the petitions in docket Nos. 5127-65, 1836-66 and 1340-68 were filed, the executors and the surviving spouse were residents of Meridian, Mississippi. Sam E. Broadhead and his wife filed their joint Federal income tax returns for the years 1961, 1962 and 1963 with the district director of internal revenue, Jackson, Mississippi. The Estate of Sam E. Broadhead and the surviving spouse filed a Federal income tax return for the *67 year 1964 with the district director of internal revenue, Jackson, Mississippi, and they filed a Federal income tax return for the year 1965 with the southeast service center, Chamblee, Georgia, on November 16, 1966. Paul E. and Sherry Broadhead, husband and wife, were residents of Meridian, Mississippi at the time the petition in docket No. 728-68 was filed. They filed a joint Federal income tax return for the year 1965 with the district director of internal revenue, Jackson, Mississippi. Petitioners in docket Nos. 5127-65, 1836-66 and 1340-68 were previously involved in litigation before this Court concerning income taxes for the years 1956, 1958, 1959 and 1960. Estate of Broadhead v. Commissioner, 391 F. 2d 841 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court. Some of the issues decided in the previous case are dispositive of certain of the issues in the present cases. Gain from sale to Ark Investments, Inc. From 1939 to at least the year 1951, Broadhead was engaged in sawmill operations in Clarke County, Mississippi. In subsequent years until about 1960, he acquired substantial timberlands in Mississippi, Arkansas, North Carolina and Louisiana. *68 During these years he sold timberlands, some of which he subsequently repossessed. Ark Investments, Inc., was formed by Herbert Frederick, Sr., who was president of the corporation. Robert McGill was vice president of the corporation as well as a stockholder. In order to obtain his interest in the corporation, McGill endorsed a $10,000 note on behalf of Frederick. About the year 1952, McGill had obtained a real estate broker's license in Baton Rouge, Louisiana, and was continuously engaged as a real 954 estate broker through the year 1962 or 1963. At Frederick's request, McGill, early in 1961, discussed with Sam E. Broadhead the sale to Frederick of certain Broadhead properties. Negotiations involving the sale of the Broadhead properties continued for a period of approximately four months. On May 18, 1961, Broadhead sold the following properties to Ark Investments, Inc., for a total amount of $2,850,000: (1) Togo Island consisting of 6,740 acres (6,100 acres located in Louisiana and 640 acres located in Mississippi); (2) 36,000 acres of Arkansas timberland; and (3) timber rights on 4,000 acres of Arkansas land known as the Pickthorn Lease. The deed transferring these properties *69 to Ark Investments, Inc., was dated May 25, 1961. The properties were subject to a first mortgage of $1,400,000 held by Connecticut General Life Insurance Company, which mortgage was assumed by Ark Investments, Inc. Broadhead received $25,000 in cash (option money), three promissory notes in the total amount of $125,000 to cover the balance due as a down payment, and an installment note for $1,300,000 for the balance payable in 15 annual installments, with interest at the rate of six percent payable semi-annually. The three promissory notes for the balance due as a down payment were due on July 1, 1961 ($5,000), August 16, 1961 ($5,000), and May 16, 1962 ($115,000). The first annual installment of $86,666.66 on the $1,300,000 note was payable one year after the date of the agreement. In connection with the acquisition of the Broadhead properties by Ark Investments, Inc., Frederick studied timber cruises which were prepared and made available to him. Prior to the execution of the deed on May 25, 1961, but after an option had been executed, Frederick and McGill made efforts over a two week period to locate purchasers for the timber on the properties. Frederick was unable to find any *70 buyers for the timber. Ark Investments, Inc., defaulted on its obligation during the year 1961 and Broadhead received only $3,911.67 toward the down payment and interest due. Broadhead paid the obligation due to Connecticut General Life Insurance Company in 1962 of principal in the amount of $121,600 and interest in the amount of $49,617.55. In January 1963, Broadhead paid the installment due to the insurance company in 1963 of principal and interest in the total amount of $160,156. In January 1964, Broadhead made a further principal payment to Connecticut General Life Insurance Co. in the amount of $121,600 plus interest. As of February 7, 1964, the remaining principal due on the Connecticut General Life Insurance Co. loan was $920,400. In consideration for the payment by Broadhead of the 1963 installment on the Connecticut General Life Insurance Co. loan, Ark Investments, Inc., transferred 3,173.73 acres of land in White County, Arkansas, and 4,462.05 acres of land in Prairie County, Arkansas (or a toal of 7,635.78 acres) to Broadhead under a deed dated January 14, 1963. Broadhead commenced foreclosure proceedings against Ark Investments, Inc., in 1962. He bid in on the properties *71 located in Arkansas and on August 12, 1963, said properties were transferred to him by a Commissioner's Deed. Broadhead acquired the Arkansas properties at the foreclosure sale for $700,000. Under the terms of a decree of the Chancery Court of Lauderdale County, Mississippi, dated May 12, 1965, certain assets which had been pledged as collateral by Frederick under the pledge agreement of May 25, 1961, were returned to Frederick by Broadhead's estate and all indebtedness between Broadhead or his estate and Ark Investments, Inc., was canceled. The properties which were sold by Broadhead to Ark Investments, Inc., in 1961 were the same properties which had previously been sold to M. J. Eubanks and which, upon Eubanks' default, had been repossessed by Broadhead in September 1960. One of the issues in Estate of Broadhead v. Commissioner, 391 F. 2d 841 (C.A. 5, 1968, affirming a Memorandum Opinion of this Court, was the amount of gain realized by Broadhead on the repossession in 1960 (Docket No. 4015-64). In computing the gain under that issue, the respondent had determined that the fair market value of the repossessed properties was $2,229,600. This Court rejected such valuation *72 and concluded that the gain, if any, realized on the foreclosure of the properties in 1960 must be computed by using as the fair market value of said properties the bid prices thereof at the foreclosure sales. Respondent mailed the statutory notice of deficiency to petitioners in docket No. 5127-65 on June 23, 1965, which was prior to the date the Opinion of the Tax Court 955 in the prior case was filed. In order to reflect the findings of the Tax Court in the prior opinion with respect to the fair market value of the Arkansas and Togo Island properties, the respondent amended his answer in docket No. 5127-65 alleging that petitioners realized gain from the sale of the properties in 1961 in the amount of $1,205,564.76 rather than the amount of $150,000 as originally determined in the statutory notice of deficiency. Respondent computed the increased gain as follows: Selling price 5/18/61
$2,850,000.00
Togo Island - 6,740 acres
Arkansas land - 36,000 acres
Timber rights on 4,000 acres known as the Pickthorn Lease
Less: First mortgage held by Connecticut General Life Insurance Co. which was assumed by buyer (Ark Investments, Inc.) 1,400,000.00
Net selling price
$1,450,000.00
Basis of properties (Arkansas and Togo Island) per Ex- hibit A of Rule 50 computation in docket No. 4015-64
$306,377.77
Less: Basis recovery in computation of loss on repossession in 1960 per Exhibit A of Rule 50 computation in docket No. 4015-64 ($171,942.53 minus $110,000.00) 61,942.53
244,435.24
Gain on sale
$1,205,564.76
*73 Broadhead did not report the sale of Togo Island, the Pickthorn Lease and the 36,000 acres of Arkansas land in 1961 to Ark Investments, Inc., in the joint Federal income tax return filed by him with his wife for the taxable year 1961. On May 25, 1965, petitioners elected to recognize no gain or loss on the repossession of the properties from Ark Investments, Inc., in 1963. This election was made pursuant to section 1038 of the Internal Revenue Code of 1954. Assignment of installment note On August 5, 1958, Broadhead sold certain timberlands located in Hyde County, North Carolina, to a partnership known as Pamlico Development Company which consisted of W. A. Powe, E. Wheeler Bryant and their associates (hereinafter called the Powe Group) for $2,419,250. As part of the purchase price, the Powe Group assumed two mortgages on the property held by Connecticut General Life Insurance Company, one in the amount of $825,000, dated October 30, 1957, and the other in the amount of $425,000, dated August 1, 1957, and later modified on October 15, 1957. The $825,000 mortgage was a first mortgage on the Hyde County, North Carolina, property and a second mortgage on *74 certain Arkansas timberlands which had been sold to Michael J. Eubanks. The $425,000 mortgage was a first mortgage on the same Arkansas timberlands and a second mortgage on the Hyde County, North Carolina, timberlands. The Powe Group, in addition to assuming the two mortgages, paid Broadhead a total of $229,250 and gave him a note dated August 5, 1958, secured by another mortgage on the Hyde County, North Carolina, timberlands in the amount of $940,000. This mortgage was subordinate to the two mortgages held by Connecticut General Life Insurance Company. Early in 1959 Michael J. Eubanks, who had purchased the Arkansas timberlands from Broadhead on July 13, 1958, persuaded Broadhead to arrange with the mortgagee on such property, Connecticut General Life Insurance Company, to release the first mortgage on the Arkansas timberlands so that Eubanks could use that property as security for a new loan. At that time the balance due on the first mortgage was $397,000. On January 14, 1959, the obligation to pay this balance was in effect assumed by the Powe Group by adding the balance of $397,000 to the $940,000 note and mortgage which the Powe Group had previsusly given to Broadhead. On *75 that date (January 14, 1959), the Powe Group executed a new note and a new deed of trust in favor of Broadhead in the amount of $1,337,000 in substitute for the $940,000 note and deed of trust securing same. In the previous case this Court held that the note in the amount of $397,000 was includable in Broadhead's income in 1959 as a receipt of part of the sales price of the Togo Island and Arkansas tracts. The Court further found that the increase of $19,000 in principal payments on the new note over the old note was applicable to the $397,000 increase in the new note. It has been stipulated herein that the annual payment of $175,000 received by petitioners from the sale of the Hyde County, North Carolina, timberlands should be reduced to 956 $156,000 for the purpose of applying the proper gross profit percentage to determine the reportable gain. In June 1962, the Powe Group sold the Hyde County, North Carolina, timberlands they had purchased from Broadhead to O. Wayne Rollins subject to the second mortgage or deed of trust in the original amount of $1,337,000 held by Broadhead. On January 9, 1963, Broadhead borrowed $190,000 from the Merchants and Farmers Bank in Meridian, *76 Mississippi. He gave his personal note for this amount and also assigned to the bank the promissory note received by him from the sale of the Hyde County, North Carolina, timberlands. The assignment of the promissory note to the bank specifically stated that it was transferred "as collateral security" for the $190,000 loan. As of October 9, 1963, the unpaid balance owed to Broadhead by the Powe Group on the second mortgage or deed of trust (which had been assumed by O. Wayne Rollins) in the original amount of $1,337,000 was $462,000 plus accrued interest from July 9, 1963, at the rate of 6 percent. The unpaid balance was payable in installments of $175,000 plus accrued interest due on July 9, 1964, $175,000 plus accrued interest due on July 9, 1965, and the balance of $112,000 plus accrued interest due on July 9, 1966. On October 9, 1963, Broadhead, who needed about $300,000 to meet certain obligations, assigned to the Merchants and Farmers Bank in Meridian, Mississippi, for the amount of $468,930.01 the above promissory note (unpaid balance of $462,000) together with the second mortgage or deed of trust in the original amount of $1,337,000 securing said promissory note. The amount *77 of $468,930.01 received by Broadhead included accrued interest on the note from July 9, 1963, to October 9, 1963, in the amount of $6,930.01. After the assignment date the Merchants and Farmers Bank undertook to make the collections on the note. The assignment of the promissory note was recorded in Hyde County, North Carolina, on October 10, 1963. The primary instrument assigning the promissory note to the Merchants and Farmers Bank provided in part as follows: WHEREAS, the Merchants & Farmers Bank of Meridian, Mississippi, is desirous of purchasing said promissory note and deed of trust for the sum of Four Hundred Sixty-Eight Thousand Nine Hundred and Thirty and 01/100 ($468,930.01) Dollars, and the benficiaries thereof, being the undersigned, are desirous of selling same to the Merchants & Farmers Bank for said amount: NOW, THEREFORE, we, the undersigned, Sam Broadhead, Verdie Cox Broadhead, Norris Broadhead, and Martha C. Broadhead, in consideration of Four Hundred Sixty-Eight Thousand Nine Hundered and Thirty and 01/100 ($468,930.01) Dollars, do hereby sell, convey, set over, transfer and assign, with recourse, to the Merchants & Farmers Bank of Meridian, Mississippi the *78 aforesaid promissory note and deed of trust dated January 14, 1959; and we do hereby authorize and direct the makers and grantors of said note and deed of trust to pay over and deliver to said bank all sums due thereon, including interest, as and when the same become due, with all other rights and benefits as provided and contained therein. We, the undersigned, do hereby each individually waive any and all notice of acceptance or notice of non-payment or of default in said note and deed of trust, and do hereby also agree to any and all extensions or renewals thereof which the said bank, in its discretion, might make, including the substitution of collateral, hereby ratifying in advance any and all acts done by said bank in regards to said indebtedness, and agreeing that we shall continue to remain liable thereon until full payment is received by the bank, including interest and attorneys fees. In addition to the primary instrument assigning the promissory note to the Merchants and Farmers Bank, a second instrument was executed by Broadhead and members of his family which stated as follows: FOR AND IN CONSIDERATION of the sum of Four Hundred Sixty-Eight Thousand Nine Hundred Thirty *79 and 01/100 ($468,930.01) Dollars, the indebtedness evidenced and represented by and this promissory note, and the deed of trust securing same, are hereby transferred, sold, assigned and delivered unto the Merchants & Farmers Bank, a banking corporation domiciled in Meridian, Lauderdale County, Mississippi, with recourse. After the assignment of the note to the bank, a payment of $175,000 plus interest of $27,720 was made to the bank by O. Wayne Rollins on July 4, 1964, leaving an unpaid balance of $287,000. This balance remained unpaid at the time of Broadhead's death early in 1965 and after a claim was filed 957 with the Estate of Sam E. Broadhead for this amount by the Merchants and Farmers Bank, the Estate paid the amount of $315,174.05 (which included interest of $28,174.05) to the bank. On March 22, 1966, O. Wayne Rollins paid the Estate of Sam E. Broadhead the balance of principal owed on the Powe Group note ($287,000) plus interest of $29,109.36. Prior to 1963 Broadhead had reported the gain realized from the sale of the timberlands in Hyde County, North Carolina, under the installment method of reporting income. In his statutory notice of deficiency in docket No. 1836-66 (which *80 was issued before the date the Tax Court's Opinion in the prior case was filed), the respondent determined that petitioners sold the Powe Group note in 1963 and, consequently, realized gain on the disposition of an installment obligation within the meaning of section 453(d) of the Code. Respondent computed the gain thus realized as follows: $462,000.00
(Unpaid balance on note 10/9/63)
60.9707
(Profit ratio)
$281,684.63
(Taxable gain in 1963)
Sales of Real Property During the years 1961 and 1963, Broadhead made the following sales of real property: 1. Sale of properties to Ark Investments, Inc., on May 18, 1961. 2. Sale of timberland in Yazoo County in 1963. 3. Sale of 40 acres of Sturgis property in Arkansas in 1963. 4. Sale of property located in Avoyelles, Louisiana on October 3, 1963, to William R. Easterling. 5. Sale of Togo Island to McGill Realtyco. on October 18, 1963. Broadhead reported the income from the 1963 sales on his Federal income tax return as long-term capital gains. Respondent determined in his statutory notice of deficiency in docket No. 5127-65 and docket No. 1836-66 that the income from these sales of property (including the *81 1961 sales which Broadhead did not report in his 1961 Federal income tax return) was taxable as ordinary income. Broadhead sold Togo Island in 1963 to McGill Realty Co. for $326,000 and reported the gain from the sale in his 1963 Federal income tax return under the installment method of reporting income. Respondent in his statutory notice of deficiency in docket No. 1836-66 computed the gain for 1963 realized by Broadhead on the Togo Island sale by attributing an adjusted basis of $269,600 to the property. This amount was based upon a fair market value for the property that was subsequently rejected by this Court in the prior Broadhead case. Broadhead sold the 40 acres of Sturgis property in Arkansas in 1963 for $1,000 and reported a gain of $700 from the sale. Respondent determined in his statutory notice of deficiency in docket No. 1836-66 that the basis of the property was $260 rather than $300 and that the gain realized in 1963 from the sale was $740. Broadhead sold the property in Avoyelles, Louisiana, which consisted of 23,000 acres, for the amount of $1,200,000 and reported the gain from the sale in his 1963 Federal income tax return under the installment method of reporting *82 income. Respondent in his statutory notice of deficiency in docket No. 1836-66 computed the gain for 1963 realized by Broadhead on this sale by attributing an adjusted basis of $629,900 to the property. This amount was based upon a fair market value for the property that was rejected by this Court in the prior Broadhead case. In computing the gain for the year 1964, the respondent determined in his statutory notice of deficiency in docket No. 1340-68 that the adjusted basis of the property was $401,820 which purportedly reflected the findings of this Court in the prior Broadhead case. Claimed Losses On Payments Made by Sam Broadhead During the year 1946 Sam Broadhead became interested in the exploration and production of oil and gas. His first investment in this business was the acquisition of a royalty interest in the Langsdale Field located near Brewer, Mississippi. He later expanded his interests in oil and gas operations by undertaking some drilling operations in Clarke County, Mississippi, and later in Texas. By 1962 Broadhead had an interest in 25 oil wells. In or about the year 1959, Broadhead became interested in drilling oil wells together with Jack Stack. The first *83 well they drilled was referred to as International Number 1 and was located at Junction City, Mississippi, and they continued to drill several more wells in Mississippi and Louisiana throughout the period of their association which lasted through December 1960. During this period of association Broadhead and Stack each paid one-half of the expenses incurred. After December 1960 Broadhead continued to own an 958 interest in certain oil wells and leases in which Stack also owned an interest. In 1964 Broadhead sold his interest in these oil wells and leases to Stack. On October 20, 1959, Broadhead acquired a one-half interest in a rebuilt S-50 Bethlehem drilling rig, which was approximately 35 years old, from the Bouchelle Drilling Company for $25,000. Broadhead paid this amount by personal check on the date of acquisition. In November 1961, Broadhead acquired the remaining one-half interest in the rig from M. G. Bouchelle for $10,000, giving his personal note dated November 27, 1961, in that amount payable over 12 months. The note was paid in full on November 8, 1962, by Broadhead Drilling Co., Inc., with its check in the amount of $10,120 which included interest of $120. In *84 January 1960, Broadhead acquired a Brewster N-4 rig, which was 15 to 20 years old, from Martin Reagan for $60,000. This amount was paid by Broadhead except for $6,000 which was paid by Broadhead Drilling Co., Inc., by checks dated May 24, 1961, and June 15, 1961, each in the amount of $3,000. In 1960 Broadhead and Jack Stack acquired a used Brewster N-75 rig from the Zack Brooks Drilling Company. Broadhead and Stack each agreed to pay $75,000, plus interest, for the rig and each executed a promissory note of $75,000 for his half of the purchase price, with monthly payments (exclusive of interest) of $2,083.33. Late in 1960 Stack encountered financial difficulties and Broadhead acquired his interest in the rig for $5,000 and assumed his remaining portion of the indebtedness. The following payments were made by Broadhead toward the total purchase price of the Brewster N-75 rig from his personal bank accounts: Amount of
Principal
Date
Bank
Payment
7- 1-60
First State Bank
$12,500.00
8- 1-60
Citizens National Bank
2,083.33
9- 1-60
First National Bank
2,083.33
10-12-60
Citizens National Bank
2,083.33
10-31-60
Citizens National Bank
2,083.33
12- 1-60
First National Bank of Laurel
2,083.33
1- 3-61
Merchants & Farmers Bank
2,083.33
1- 3-61
Merchants & Farmers Bank
2,083.33
1- 3-61
Merchants & Farmers Bank
2,083.33
8- 1-61
First National Bank of Laurel
55,000.00
1-18-64
Merchants & Farmers Bank
5,000.00
10-14-64
Merchants & Farmers Bank 5,000.00
$94,166.64
Payment to Stack on 11-2-60 for his interest in rig
5,000.00
Total
$99,166.64
*85 In addition to the payments made by Broadhead from his personal bank accounts, Broadhead Drilling Co., Inc., made a payment on the rig in the amount of $15,000 by check dated December 14, 1961. After the death of Sam E. Broadhead on February 6, 1965, the unpaid balance owing on the rig, including interest, was $61,500, which amount included the indebtedness assumed by Broadhead. On July 21, 1965, the executors of the Estate of Sam E. Broadhead returned the rig to Chesley Pruet Drilling Company (successors to Zack Brooks Drilling Company) for a credit of $47,250. On the same date the Estate of Sam E. Broadhead paid $14,250 to Chesley Pruet Drilling Company in full settlement of the indebtedness. Prior to the year 1961, Broadhead had claimed total deductions for depreciation in the amount of $30,716.66 on the drilling rigs acquired by him and in his 1961 Federal income tax return, he claimed a deduction for depreciation on the rigs in the amount of $50,000. In January 1962, Broadhead transferred the Brewster N-4, Brewster N-75 and Bethlehem S-50 drilling rigs to Broadhead Drilling Co., Inc., which used the rigs in its drilling operations. Broadhead Drilling Co., Inc., insured the *86 rigs and paid the premiums on the policies. Broadhead reported the sale of the three drilling rigs to Broadhead Drilling Co., Inc., on his Federal income tax return for 1962. Broadhead reviewed the 1962 Federal income tax return, which was prepared by one Thompson, before it was filed with the Internal Revenue Service. Tax returns for other years had been prepared by Mr. Sutton, counsel for petitioners, but his illness made it necessary for the 1962 return to be prepared by someone else. Broadhead Drilling Co., Inc., was incorporated in December 1960 under the laws of the State of Mississippi by Broadhead's two sons and three daughters who held all of the stock in the corporation. Norris Broadhead was president of the corporation 959 and was concerned with the daily operational aspects of the corporation while Paul Broadhead, as secretary, was concerned with the administrative and selling aspects of the corporation. Both Norris and Paul were university graduates. Paul's educational background was in the liberal arts and in banking and finance while Norris had a background in business adminstration and geology. Broadhead, although neither an officer nor a stockholder of the corporation, *87 participated in the decisions made on behalf of the corporation and also advanced money to the corporation. Both Norris and Paul received their compensation directly from Broadhead who charged such payments in part as advances to Broadhead Drilling Co., Inc. Broadhead's method of compensating his two sons was to pay all of the living expenses of Norris (who was then married) and to provide additional amounts for cash expenditures, while he paid for the personal expenses of Paul up to $30 per week. Broadhead also paid the Federal income taxes and payroll tax liabilities incurred by Paul and Norris during the period here relevant. The office and records of the Broadhead Drilling Co., Inc., were maintained in a room in Broadhead's residence where the bookkeeper-secretary (Leontine Meacham) and both Norris and Paul had desk space. Broadhead also conducted his activities from this office. Paul spent about one-half of his time in Jackson, Mississippi, in order to contact third parties with an interest in drilling oil wells. Decisions as to the bidding on jobs as well as the relevant prices and terms were customarily made upon Paul's return to Meridian, Mississippi. The corporation had *88 no bank account in the first two months of its existence and Broadhead advanced funds to the corporation for its initial expenses. In subsequent years Broadhead on occasion guaranteed loans obtained by the corporation from third parties. At first, all checks drawn on the bank account of Broadhead Drilling Co., Inc., were signed either by Norris or Paul Broadhead. At a later date, two signatures were required, with the signatures of Norris and Paul Broadhead or the signature of Broadhead together with the signature of Norris or Paul satisfying the requirement. In September 1961, Broadhead Drilling Co., Inc., purchased a drilling rig (Model N-125-H) from Mid-Continent Supply Company for approximately $215,000. Broadhead and his two sons obligated themselves to pay for the rig. In 1962 the drilling rig was repossessed. As of April 10, 1961, Jett Drilling Co., Inc., owed the amount of $55,000 to Broadhead Drilling Co., Inc., for the latter corporation's services in drilling a well in Smith Country, Mississippi. On that date Broadhead Drilling Co., Inc., assigned its right to receive $55,000 from Jett Drilling Co., Inc., to Zack Brooks Drilling Company. The Assignment of Account executed *89 by Broadhead Drilling Co., Inc., stated that the assigned amount was to be applied to the indebtedness of Broadhead to Zack Brooks Drilling Company (incurred in the purchase by Broadhead of the Brewster N-75 rig from Zack Brooks Drilling Company) which had been assumed by Broadhead Drilling Co., Inc. However, the assignment was not carried out as planned. Instead, Jett Drilling Co., Inc., paid the amount of $55,000 directly to Broadhead Drilling Co., Inc., by a check which was eventually deposited in Broadhead's bank account in The First National Bank of Laurel on July 28, 1961. Broadhead then paid Zack Brooks Drilling Company. Most of the oil wells drilled by Broadhead Drilling Co., Inc., were drilled under contract for third parties. The corporation commenced drilling oil wells in January or February of 1961. During 1961, the corporation drilled a total of 28 wells. In the years 1962, 1963 and 1964, the corporation drilled 30 wells, 11 wells and 1 well, respectively. Broadhead Drilling Co., Inc., ceased its operations late in 1964. Within two or three months after its incorporation, Broadhead Drilling Co., Inc., opened a bank account which it maintained in its corporate name. *90 In October 1961, Broadhead Drilling Co., Inc., employed Leontine Meacham to maintain payroll records and other corporate books and records. The corporation was sued in its corporate name in Mississippi State courts on at least two occasions. The corporation obtained an employer identification number and filed Federal income tax returns. In its Federal income tax return for 1962, Broadhead Drilling Co., Inc., claimed a deduction for depreciation on the drilling rigs transferred to the corporation by Broadhead as follows: Depreciation
Rig
Deduction
S-50 Bethlehem
$ 9,936
Brewster N-4
10,800
Brewster N-75 39,085
Total
$59,821 960 Broadhead Drilling Co., Inc., also claimed a deduction for depreciation on the three rigs in its 1963 Federal income tax return in the total amount of $59,821. No depreciation deductions on the drilling rigs were claimed by the corporation in its 1964 Federal income tax returns. Oil rigs undergo enormous wear and tear while in operation and certain parts have to be continually replaced. The acidity of the fluids in the drilling operations causes equipment to rust and deteriorate. In 1964 the mud pump (an integral part of *91 a drilling rig) on the Brewster N-4 rig burst and was not replaced. At that time a new mud pump would cost approximately $25,000 while a used mud pump would cost about $4,000 or $5,000. In the Federal estate tax return filed by the Estate of Sam E. Broadhead, the following miscellaneous property owned by decedent at date of death (February 6, 1965) was included in Schedule F with a total valuation of $69,000: Oil rigs (1 Brewster, Model N-75; 1 Brewster, Model N-4; 1 Bethlehem rebuilt, with no surviving original parts except platform and block gear) all idle. Portions of the Brewster N-4 rig were still in the possession of the Estate of Sam E. Broadhead as of the date of the trial. The S-50 Bethlehem rig was stored by the Estate of Sam E. Broadhead at Needham, Alabama, and subsequently sold for about $1,500. During the years 1961 through 1964, Broadhead advanced funds by check to Broadhead Drilling Co., Inc., and received funds from Broadhead Drilling Co., Inc., in the following amounts: Received
Excess Over
Advanced to
from
Amount
Year
Corporation
Corporation
Advanced
1961
$ 95,250.00
$251,607.47
1962
94,450.00
70,000.00
1963
69,685.85
23,765.60
1964 24,202.93
14,000.00
$283,588.78
$359,373.07
$75,784.29
*92 During the years 1961, 1963 and 1964, Broadhead paid expenses of Broadhead Drilling Co., Inc., directly to the corporation's creditors in the respective amounts of $77,980.95, $17,931.14 and $111,690.24, or a total of $207,602.33. In the 1964 Federal income tax return filed by Virdie C. Broadhead (the surviving spouse) and the Estate of Sam E. Broadhead a deduction of $528,170 was claimed as losses of business property. The components of the claimed loss were as follows: Drilling rig repossessed for advances
$93,170
Mortgage unpaid on purchase price 65,000 $158,170
Advances to liquidated drilling agent unpaid (no assets)
94,000
Advances to drilling and leasing ven- ture unpaid unrecovered
166,000
Loss on second mortgage transaction (Eubanks) 110,000
Total
$528,170 Respondent in his statutory notice of deficiency in docket No. 1340-68 disallowed this deduction in full with the explanation that "it has not been established that you are entitled to any deduction within the meaning of section 165 or any other code section of the 1954 Internal Revenue Code." Understatement of Capital Gains In the 1964 Federal income tax return (which was filed *93 after the death of Sam E. Broadhead), capital gains were reported in the total amount of $853,694. Respondent determined in his statutory notice of deficiency in docket No. 1340-68 that petitioners realized capital gains in 1964 in the total amount of $877,217.24, or an increase of $23,523.24, resulting in an increase in petitioners' taxable income in the amount of $11,761.62. Respondent's determination resulted from (1) an adjustment in the basis of certain Arkansas timberlands sold by Broadhead in 1964 and (2) an adjustment in the profit ratio applicable to installment collections in 1964 with respect to the sale in a prior year of timberlands in Avoyelles Parish, Louisiana, to W. R. Easterling. Respondent determined the adjusted basis of the Arkansas timberlands in the following manner: Fair market value (1960) repossession determined by Tax Court
$ 231,000.00
Due Connecticut General Life Insurance Co. 1960 1,528,400.00 $1,759,400.00
Add - Gain recognized on 1961 sale
150,000.00
Amount paid Connecticut General Life Ins.co. in 1962 and 1963 and capitalized by Internal Revenue Service
88,173.55 961 Legal, professional expenses for 1964 and 1965 capitalized by In- ternal Revenue Service
1,445.62
Amount paid for selling expense in 1963 and capitalized by Internal Revenue Service 3,465.00
243,084.17
Total basis - 42,740 acres
$2,002,484.17
Per acre basis - $46.85
*94 The total of 42,740 acres used by respondent in the above computation of basis includes the Togo Island property in the amount of 6,740 acres and the Arkansas properties in the amount of 36,000 acres. In their 1964 Federal income tax return, the petitioners reported an installment payment on a prior-year sale of timberlands in Avoyelles Parish, Louisiana, to W. R. Easterling. Petitioners included 50 percent of the payment in Schedule D of the return as a long-term capital gain. Respondent determined in the statutory notice of deficiency in docket No. 1340-68 that a profit ratio of 66.52 percent was applicable to the installment payment and, accordingly, determined that $109,850.98 represented the taxable gain in 1964 (66.52 percent of $165,139.77). Respondent computed the profit ratio of 66.52 percent by attributing a basis of $401,820 to the Avoyelles Parish property ($400,000 represented the bid price paid by Broadhead at the foreclosure of this property in 1960 and $1,820 represented capitalized legal expenses), resulting in a gain of $798,180 from the sale of the property to Easterling (selling price of $1,200,000 less a basis of $401,820), which gain represented a profit of *95 66.52 on the sale ($798,180 from the sale of the property to Easterling (selling price of $1,200,000 less a basis of $401,820), which gain represented a profit of 66.52 on the sale ($798,180 divided by $1,200,000). Claimed Contribution Deduction to Sam Broadhead Foundation In November 1964, Broadhead established the Sam Broadhead Foundation with Norris and Paul as trustees. In March 1966, the foundation was granted tax-exempt status by the Internal Revenue Service as an organization described in section 501(c)(3) of the Internal Revenue Code of 1954. In the 1964 Federal income tax return (which reported a loss for the year), a statement was made that the taxpayers made a charitable contribution in 1964 in the amount of $300,000 but (inasmuch as the return showed a loss) no specific amount was actually claimed as a deduction. The contribution represented a purported transfer in 1964 by Sam E. Broadhead of his 68 percent stock interest in the Lamar Hotel Corporation to the Sam Broadhead Foundation. Respondent made the following adjustment to petitioners' income for 1964 in the statutory notice of deficiency in docket No. 1340-68: (i) It is determined *96 that a deduction for contributions to Sam Broadhead Foundation is allowable in the amount of $80,172.67 which was not claimed on the income tax return. The amount of allowable contribution deduction is computed as following: Fair market value of Lamar Hotel Corporation stock $300,000.00
Allowable deduction - 20% of cor- rected taxable income as com- puted below -[$400,863.37] Sec. 170(b)(1)(B) of the Internal Rev- enue Code of 1954
$ 80,172.67
Claimed Deduction for Oil Operation Expenses In the 1965 Fedral income tax return filed by Virdie C. Broadhead (the surviving spouse) and the Estate of Sam E. Broadhead, a deduction was claimed for oil operation expenses in the total amount of $6,934.90. Respondent in his statutory notice of deficiency in docket No. 1340-68 disallowed $6,813.74 of this amount. The disallowed amount included the following items: Payee
Amount
The Southland Company
$5,755.78
Henry Gordon
100.00
Chance Sales and Service 957.96
$6,813.74 The disallowed amounts were paid on behalf of Broadhead Drilling Co., Inc., and represented expenses incurred by the corporation in the course of its oil well drilling operations. *97 Broadhead paid the amount of $5,755.78 to The Southland Company by check dated October 16, 1964. The Eubanks Transaction In 1964 Broadhead made a loan to M. J. Eubanks who gave Broadhead a deed of trust on a residence and 75 acres of land in Lumberton, Mississippi. Broadhead subsequently discovered a prior deed of trust on record which constituted a prior 962 lien on the property. Foreclosure proceedings were instituted and Broadhead purchased the property at the foreclosure sale. Broadhead's total cost for the property, including the amount of the deed of trust held by him, was $110,000. In 1966 the property (residence and land) was sold for $65,000 by the Estate of Sam E. Broadhead. Late Filing of Income Tax Return In or about September 1966, the Estate of Sam E. Broadhead was engaged in litigation in a State court at Meridian, Mississippi, and in another State court located about 120 miles from Meridian. The Estate of Sam E. Broadhead and Virdie C. Broadhead filed a Federal income tax return for 1965 with the southeast service center, Chamblee, Georgia, on November 16, 1966, with an attached letter dated November 14, 1966. An extension of time for filing the 1965 *98 income tax return had been granted to October 15, 1966. The attached letter stated that the 1965 income tax return was untimely filed for the following reasons: (1) State law dealing with trusts and estates required a reconciliation of accounts and advice from an attorney; (2) the time-consuming requirement of obtaining a State court order for every act and transaction of the Estate; and (3) pending litigation in State courts consumed much of the time of the Estate. Opinion 1. Gain on sale of property to Ark Investments, Inc. Respondent determined in his notice of deficiency for 1961 that the petitioners [4] received a gain of $150,000 from the sale of various properties to Ark Investments, Inc. Such determination was based on the disallowance of an adjusted basis of $2,229,600, which was the fair market value determined by respondent on repossession in the prior cases involving the Estate of Sam E. Broadhead. While the present cases were pending, this Court filed its opinion in the prior related cases of Estate of Sam E. Broadhead, T.C. Memo. 1966-26, affirmed 391 F. 2d 841 (C.A. 5, 1968). In its opinion this Court decided that the fair market value of *99 the properties sold to Ark Investments, Inc., was the sum of the bid prices at which Sam Broadhead repurchased them at various foreclosure sales. In recognition of this Court's opinion in the prior cases, respondent then amended his answer to allow an unrecovered basis in the properties sold to Ark Investments, Inc., of $244,435.24. This was the amount determined in the Rule 50 computation in the prior cases. The change in the basis to correspond with the determination of this Court in the prior opinion results in a gain determined by respondent of $1,205,564.76. It is this amount which respondent contends is taxable to petitioners. Respondent's position is based upon the assumption that the secured notes were worth their full face value. Thus the fair market value of the notes is the pivotal question. Petitioners contend that respondent has the burden of proof on this issue because he amended his answer to allege an increased deficiency. In view of this Court's prior opinion affecting the basis of the properties, the respondent merely amended his answer to increase the amount of gain reportable. *100 In no way did respondent change his initial determination that petitioners failed to report gain from the sale. The gravamen of the issue is the same and we think the evidence supports respondent's position. Section 1001(b) of the Code provides that "amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Income is realized to the extent that the cash, plus the fair market value of the notes, exceeds the adjusted cost or other basis of the property. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. Fitts' Estate v. Commissioner, 237 F. 2d 729 (C.A. 8, 1956); Williams v. Commissioner, 256 F. 2d 217, 218 (C.A. 9, 1958). The fair market value of a note and mortgage at a particular time is a question of fact to be determined by all circumstances connected with the underlying mortgage. Riss v. Commissioner, 368 F. 2d 965 (C.A. 10, 1966). Petitioners argue that the Ark Investments transaction was "speculative," the *101 implication being that the notes had no 963 ascertainable value when received and that no amount should be taken into account in reporting their income for 1961. Respondent, on the other hand, contends that the notes should be deemed to have a fair market value equal to their face amounts. In support of their position the petitioners rely heavily on the testimony of Robert E. McGill and Hebert Frederick, Jr. The testimony of these witnesses is of no benefit in reaching a determination as to the value of the notes. Hebert Frederick, Jr., stated that his father, who formed Ark Investments, Inc., and who was its president, had no plans ready for the first year payment due to the Connecticut General Life Insurance Company or Broadhead. Yet on cross-examination he admitted that he was not familiar with the day-to-day finances of his father. He further admitted that his father owned several other properties and that it was possible that his father could have sold other property to obtain funds. Robert McGill, who was a friend of Hebert Frederick and participated in negotiatio nns involving the sale, stated that in his opinion it was speculative as to whether the purchase price would *102 be paid and that he did not think Frederick had sufficient assets to pay the $1,300,000 note. He admitted that Frederick could have paid the downpayment notes of $125,000. On cross-examination he stated that he had no real knowledge of Frederick's financial background and that he never saw any financial statements of Frederick. He further admitted that he was not familiar with the amounts of the payments necessary to be made to Connecticut General or to Sam Broadhead on the $1,300,000 promissory note. We think McGill was not sufficiently cognizant of the facts to express a sound opinion. There has been no showing that Frederick was not financially responsible, which is an essential factor for consideration. Sallie M. Wortham, 3 B.T.A. 1307 (1926). McGill and Frederick admitted that Hebert Frederick owned other properties and there is no doubt as to his solvency. No proof was offered as to the marketability of the notes. There is no evidence that Broadhead attempted to dispose of the notes to any banks or in the open market. No evidence was introduced to show that the land itself was not ample security for the notes. There has been no showing that the amount of the notes *103 could not have been collected out of the property and from the person primarily liable thereon. The notes given to Broadhead were secured and provided for payment of interest at 6 percent per annum. The downpayment notes were secured by sufficient collateral to insure their payment. The promissory note of $1,300,000 was secured by the real estate and there is no evidence showing that its value was not sufficient to insure payment of the $1,300,000 note. Evidence of the value of the land is relevant in determining the fair market value of the notes received by Broadhead. Bar L Ranch, Inc., v. Phinney, 426 F. 2d 995 (C.A. 5, 1970). In the absence of evidence to the contrary, we conclude that the parties acted at arm's length and that they judged the real property to be equal in value to the property for which they exchanged. Bar L Ranch, Inc., v. Phinney, supra. Generally, where a note is secured by collateral, or the maker has some assets, it will not be regarded as having no fair market value, even though it may not be worth its face amount. Estate of William Walker, 4 T.C. 390 (1944); Sallie M. Wortham, supra.In the absence *104 of evidence to the contrary, we conclude that the notes had value equal to their face amounts. Consequently, on the basis of evidence before us, we think respondent has determined the correct amount of the gain taxable on the sale of such properties. 2. Election of installment method. Petitioners did not report on their joint Federal income tax returns for 1961 or for any subsequent year the sale or any income from the sale of the real properties to Ark Investments, Inc. The sale was made on May 18, 1961, and petitioners received $25,000 in cash on the date of the sale and collected an additional $3,911.67 on the downpayment notes of $125,000 given in connection with the sale. At the trial of these cases petitioners' counsel stated that they elect to report the sale on the installment method pursuant to section 453 of the Code, and a "Motion for Recognition of Election" was filed. The Court permitted the issue to be raised and argued on brief. Section 1.453-8(b)(1), Income Tax Regs. provides as follows: (b) Sales of real property and casual sales of personal property. (1) A taxpayer who sells or otherwise disposes of real property, * * *, and who elects to report the income therefrom *105 on the installment method must set forth in his income tax return (or in a statement attached thereto) for the year of the sale or other disposition the computation of 964 the gross profit on the sale or other disposition under the installment method. In any taxable year in which the taxpayer receives payments attributable to such sale or other disposition, he must also show in his income tax return the computation of the amount of income which is being reported in that year on such sale or other disposition. In Revenue Ruling 65-297, 1965-2 C.B. 152, the Internal Revenue Service modified its position in regard to the election of installment method of reporting. The ruling states, in part, as follows: In the disposition of cases, if, in good faith, the taxpayer failed to exercise the installment method election to report income from the sales of real property and casual sales of personal property on a timely filed original return for the year of sale, the Service will recognize as valid, elections made under the following circumstances: 1. Those cases where the sale took place in a taxable year ended before December 18, 1958, if the election was made in the return *106 for the year the first payment from the sale was received. December 18, 1958, is the date the present regulations were effective. 2. Those cases where election of the installment method was made on an amended return for the year of sale not barred by the statute of limitations or the operation of any other law or rule of law, if the facts indicate no election inconsistent with the installment election had been made with respect to the sale. 3. Those cases where the election had been made on a delinquent return for the year of sale. It is obvious that paragraphs 1 and 3 of the revenue ruling are not applicable to the facts presented in these cases. Thus, the question is whether paragraph 2 is applicable to permit the election to be raised by petitioners. Respondent argues that paragraph 2 is inapplicable for three reasons: (1) Petitioners did not in good faith fail to exercise the installment method election; (2) petitioners have to date made no election of the installment method on an amended return for 1961; and (3) the failure of petitioners to report the sale and income received therefrom in 1961 is inconsistent with the election of the installment method. He cites our opinion *107 in John Harper [Dec. 30,129], 54 T.C. 1121 (1970), as controlling on this issue. We disagree with the respondent. The Harper case is limited to the situation where a taxpayer fraudulently conceals a sale of real property and his fraudulent omission is later discovered by the Commissioner. Here, by contrast, we think there was a good faith "silence" in the 1961 return, and not a deliberate, fraudulent concealment. It is our view that the petitioners should not be precluded from computing their income tax liability by use of the installment method. See F. E. McGillick Co., 42 T.C. 1059, 1066-1067 (1964), indicating that we would follow "the principles announced" in Baca v. Commissioner, 326 F. 2d 189 (C.A. 5, 1964). See Hornberger v. Commissioner, 289 F. 2d 602 (C.A. 5, 1961). Accordingly, we decide this issue in favor of the petitioners. 3. Attempted revocation of election under section 1038. The property sold to Ark Investments, Inc., in 1961 was repossessed by Broadhead in 1963. On May 25, 1965, petitioners elected to recognize no gain or loss on repossession of the lands from Ark Investments, Inc., in 1963. Such election *108 was made pursuant to the provisions of section 1038 of the Code. On December 1, 1970, during the trial of these cases, petitioners filed a motion which attempts to renounce the 1965 election. In the process of enacting section 1038, Congress provided taxpayers with the opportunity to elect the provisions of that section in re acquisitions of real property occurring in taxable years beginning after December 31, 1957, and before September 3, 1964. The election, if made, applied to all repossessions in taxable years beginning after December 31, 1957, and before September 3, 1964, which were not barred by the statute of limitations on the assessment of deficiencies. However, the election, to have been effective, must have been made prior to September 3, 1965. Section 1.1038-3 (b)(1)(ii), Income Tax Regs. Since the election was made by petitioners on May 25, 1965, it was timely. Section 1.1038-3(b)(1)(iv), Income Tax Regs., provides that the election, once having been made, is irrevocable after September 3, 1965. Here the petitioners' first attempt to revoke or renounce their election was in the motion filed with the Court on December 1, 1970, over 5 years after the date specified in *109 the regulations. Accordingly, we hold that petitioners are not entitled to revoke the election. 4. Sales of real property - ordinary income or capital gains. We are confronted with the 965 issue as to whether petitioners are entitled to capital gain or ordinary income treatment with respect to the gains and profits realized from the following sales of real property in 1961 and 1963: (1) Sale of lands to Ark Invesments, Inc., on May 18, 1961 (2) Sale of Yazoo County timberland in 1963 (3) Sale of 40 acres of Sturgis property in 1963 (4) Sale of property in Avoyelles, Louisiana in 1963 to William R. Easterling on October 3, 1963 (5) Sale of Togo Island on October 18, 1963 to McGill Realty Co. The resolution of this issue depends upon whether the properties sold were capital assets in petitioners' hands or were held by them primarily for sale to customers in the ordinary course of a trade or business within the meaning of section 1221(1) of the Code. It is the respondent's position that the various properties involved were held by the petitioners primarily for sale to customers in the ordinary course of their trade or business. Raymond Bauschard, 31 T.C. 910, *110 affirmed 279 F. 2d 116 (C.A. 9, 1970) which in turn cites Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1956), for the proposition that the capital gains provisions are an exception to the normal tax rates and, thus, are to be narrowly construed. The Supreme Court in the Corn Products case pointed out that Congress intended that profits and losses arising from the everyday operation of a business are to be considered as ordinary income or loss rather than capital gain or loss, that the preferential capital gains treatment applies to transactions in property which are not the normal source of business income, and that such treatment was intended to relieve the taxpayer from excessive tax burdens on gains resulting from a conversion of capital investments and to remove the deterrent effect of those burdens on such conversions. Subsequently, in Malat v. Riddell, 383 U.S. 569 (1966), the Supreme Court stated that the words of revenue acts should be interpreted where possible in their ordinary, everyday sense. There is set forth the following rule for interpreting section 1221: The purpose of the statutory provision with which we deal *111 is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S. Ct. 20 24, 100 L. Ed. 29) and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S. Ct. 1497, 1500, 4 L. Ed. 2d 1617.) * * * In Malat it was held that the word "primarily" as used in section 1221(1) means "of first importance" or "principally." Many factors have been detailed by the courts as aids in determining this issue, although no one test is necessarily decisive. Among the criteria used are the purpose of the taxpayer in acquiring a property; the length of time a property is held; the continuit yy and frequency of sales; the substantiality of the income from the sales; and the activity of the seller with respect to the property, such as the presence or absence of improvements to increase its marketability or activities in promoting sales, including advertising or listing with real estate brokers. See, e. *112 g., W. T. Thrift, Sr., 15 T.C. 366 (1950). As pointed out by respondent, in determining whether property is held primarily for sale, the fact that it was not originally acquired for resale is not controlling. Rather, the test is whether the property was primarily held for sale when the sale was made. Robert W. Pinter, 48 T.C. 906, 915 (1967), affirmed 419 F. 2d 213 (C.A. 9, 1970). Respondent's determination is presumed to be correct and the petitioners have the burden of proving it wrong. Welch v. Helverin, 290 U.S. 111 (1933). Petitioners have presented little evidence on this issue other than attempt to portray Sam Broadhead as one who had no desire to sell the land acquired by him. Broadhead obviously had no reluctance to sell when the price was right because he sold several tracts in 1963 and one tract in 1961. Three additional sales were made in 1962 of the Sturgis property. In connection with the sale to Ark Investments, Inc., in 1961, McGill testified that Broadhead did not commit himself to sell at the first price offered but he did eventually agree to the sale. The testimony of McGill also makes it quite clear that no *113 significance can be placed on Broadhead's reluctance to sell. McGill testified that Broadhead would not commit himself on possible business 966 transactions whether such transactions involved the selling of real estate or a car. It is also clear that Broadhead did not need advertising to sell lands since his holdings were quite extensive and naturally attracted real estate people. In this respect, McGill, who was a real estate salesman, testified that on many occasions he talked to Broadhead about his selling land as well as buying land. In the prior case, Estate of Sam E. Broadhead, T.C. Memo. 1966-26 affirmed 391 F. 2d 841 (C.A. 5, 1968), this Court was persuaded by the fact that Sam E. Broadhead was attempting to arrange timbercutting operations on his lands throughout at least the taxable year 1958. By contrast, the record in the instant case makes it obvious that such activities ceased prior to the taxable year 1961. As we noted in Robert W. Pointer, supra, intent is subject to change and one must look to the purpose for which the property is held at the time of sale. In our view Sam Broadhead decided land operations were more profitable *114 than sawmill operations and the intent for which the property was held changed. The number of sales fully justifies the conclusion that the property as of January 1, 1961, was being held "principally" for sale to customers in the ordinary course of a trade or business. Upon consideration of the entire record, it is our opinion that the petitioners have failed to prove that the properties involved were not held by them primarily for sale to customers in the ordinary course of a trade or business. Accordingly, we approve the respondent's determination. 5. Assignment of installment note. The facts with respect to this matter do not seem to be in dispute. We must decide whether the petitioners disposed of installments due on the Powe Group note within the purview of section 453(d) by its transaction with the Merchants & Farmers Bank on October 9, 1963. In 1958 Sam Broadhead sold timberlands located in Hyde County, North Carolina, to a partnership known as Pamlico Development Company which consisted of W. A. Powe and associates (the Powe Group), for $2,419,250. As part of the purchase price, the Powe Group assumed two mortgages on that property held by the Connecticut General Life *115 Insurance Company. One of the mortgages in the amount of $425,000 was a first mortgage on Arkansas timberlands sold to Michael J. Eubanks. It was also a second mortgage on the Hyde County, North Carolina, timberlands. In addition, the Powe Group paid Sam Broadhead a total of $229,250 and gave him a note dated August 5, 1958, secured by another mortgage on the Hyde County, North Carolina, timberlands in the amount of $940,000. This mortgage was subordinate to the two mortgages held by the Connecticut General Life Insurance Company. The sale was reported on the installment method. In early 1959 Michael J. Eubanks prevailed upon Broadhead to arrange with the mortgagee, Connecticut General Life Insurance on the Arkansas timberland in question so that he could use that property as security for a new loan. At that time the balance due on the first mortgage to Connecticut General Life Insurance Company on the Arkansas timberlands purchased by Michael J. Eubanks from Sam Broadhead was $397,000. On January 14, 1959, the obligation to pay this balance was in effect assumed by the Powe Group. This was done by adding the balance due thereon to the $940,000 note and mortgage the Powe Group had *116 previously given to Sam Broadhead. In consequence thereof, the Powe Group executed a new note and a new deed of trust in favor of Sam E. Broadhead in the amount of $1,337,000 in substitute for the $940,000 note and deed of trust securing same property. The unpaid balance owed to Sam Broadhead by the Powe Group on the promissory note (which was assumed by O. Wayne Rollins in 1962) in the original amount of $1,337,000 as of October 9, 1963, was $462,000 plus accrued interest from July 9, 1963, at the rate of 6 percent. This unpaid balance was to be paid in installments of $175,000 plus accrued interest due on July 9, 1964; another $175,000 plus accrued interest due on July 9, 1965, and the balance of $112,000 plus accrued interest was due to be paid July 9, 1966. On October 9, 1963, Sam Broadhead assigned the promissory note with a principal amount still due of $462,000 secured by the second mortgage or deed of trust in the original amount of $1,337,000 on the Hyde County, North Carolina, timberlands along with that mortgage to the Merchants & Farmers Bank of Meridian, Mississippi, for the sum of $468,930.01. This amount included accrued interest on said note from July 967 9, *117 1963, to October 9, 1963, in the amount of $6,930.01. After the assignment date, the Merchants & Farmers Bank undertook to make the collections on the note. It also proceeded to protect its position by recording the assignment in Hyde County, North Carolina, on October 10, 1963. Prior to making the loan the bank verified that the balance remaining on the promissory note in the principal amount of $1,337,000 was $462,000 plus interest of $6,930.01. When Sam E. Broadhead died, there was due on the promissory note the sum of $287,000. The bank filed a claim with the estate for such amount and on February 23, 1966, the estate paid to the Merchants & Farmers Bank the sum of $315,174.05, which consisted of the principal amount of $287,000 plus interest of $28,174.05. The bank filed its claim against the estate because at the time of the death of Sam E. Broadhead the note had not been paid in full by O. Wayne Rollins. At the time the claim was probated there was no amount past due on the note. When the check for $315,174.05 was received, the bank on the same date released all of its interest in the promissory note and transferred it to the estate. On March 22, 1966, O. Wayne Rollins paid *118 the Estate of Sam E. Broadhead the principal balance of $287,000 owed on the promissory note plus interest of $29,109.36, for a total of $316,109.36 in full satisfaction of the promissory note. After the assignment of the promissory note to the Merchants & Farmers Bank, one payment of $175,000 plus interest of $27,720 was paid to the bank on July 9, 1964. This left an unpaid balance of principal of $287,000. The payment of July 9, 1964, was made directly to the bank by O. Wayne Rollins. After receipt of the payment on July 9, 1964, the bank notified Sam E. Broadhead that it had received the money. Under the provisions of section 453(d) of the Code a satisfaction, distribution, transmiss 2ion, sale, exchange or other disposition of an installment obligation will generally result in recognition of gain or loss. We think the facts here support the conclusion that the installment obligation was sold to the Merchants & Farmers Bank with recourse or, at the very least, that there was a disposition of the installment obligation within the purview of section 453(d). The primary instrument executed in connection with the transaction clearly states that the Merchants & Farmers Bank was *119 desirous of purchasing the note and that the Broadheads were desirous of selling. The instrument further provides that the Broadheads "do hereby sell, convey, set over, transfer and assign, with recourse" the note to the bank. The instrument authorizes the makers and grantors of the note to pay over all sums due under the note to the bank. Under the terms of the instrument, the Broadheads were to remain liable on the note until full payment was received by the bank. The second instrument involved in the transaction also refers to the transaction as a sale with recourse. There is no evidence that a separate promissory note was given to the bank by Sam Broadhead for the amount of $468,930.01 received by him on the transaction. He simply agreed to remain liable on the promissory note due from the Powe Group if it was not paid. The October 9, 1963, transaction also differed from a previous loan obtained by Broadhead from the bank with the Powe Group note as collateral. Broadhead had previously obtained a $190,000 loan from the same bank on January 9, 1963. In that instance he gave a promissory note for the amount and secured his personal note by the note due from the Powe Group. The *120 assignment of the promissory note as security for the $190,000 loan specifically stated that it was transferred as collateral security. The president of the Merchants & Farmers Bank testified that the bank prepared the instruments in the form as executed on October 9, 1963, due to the fact that its attorney believed it best to proceed in that manner because of the amount of money involved. The instruments executed in connection with the transaction leave no doubt that the bank treated the October 9, 1963, transaction considerably different from a mere loan. Petitioners' contention that there was a loan seems predicated on the fact that Sam Broadhead had an obligation to make good on the note in the event that the Powe Group or O. Wayne Rollins did not make the payments as provided under the terms of the note. This fact is not incompatible with the theory of a sale. East Coast Equipment Co. v. Commissioner, 222 F. 2d 676, 677 (C.A. 3, 1955). The facts herein are somewhat analogous to those present in Elmer v. Commissioner, 65 F. 2d 568 (C.A. 2, 1933), where the Court held the 968 transactions to be sales. See also Joe D. Branham, 51 T.C. 175 (1968); *121 and Alworth-Washburn v. Helvering, 67 F. 2d 694 (C.A.D.C. 1933), affirming 25 B.T.A. 140 (1932). In resolving this question we think it is unnecessary to make a distinction between the terms "loan" and "sale." Section 453 is applicable in either instance. Sam Broadhead received cash for the full balance of the promissory note due from the Powe Group, plus interest. He no longer possessed any title or right to the annual installment payments. He had received his money and, except for a contingent liability in the event of a default by the Powe Group, the transaction was closed. Regardless of how one views the transaction, the substance is the same. The installment feature was abandoned by Broadhead in 1963 for cash equal to the remaining balance of the note plus interest. He parted with full ownership rights in the installment obligations so as to require the conclusion that he, in effect, sold or otherwise disposed of the obligation. The fact that he may have had a continuing liability is not determinative. Alworth-Washburn v. Helvering, supra. If, as petitioners contend, the transaction was a "loan" with the note due from the Powe Group *122 being collateral security, there was still a disposition within the provisions of section 453(d). The alleged loan, if so construed, was equal to the face amount of the installment obligation and as such would constitute a disposition of the obligation. Such an arrangement would be a little different from an outright sale with recourse. Accordingly, we sustain respondent's determination on this issue. 6. Claimed business losses. Petitioners claimed on their Federal income tax return for 1964 deductions for the following business losses which were disallowed by the respondent: Drilling rig repossessed for advances
$93,170.00
Mortgage unpaid on pur- chase price 65,000.00 $158,170.00
Advances to liquidated drilling agent unpaid (no assets)
94,000.00
Advances to drilling and leasing venture unpaid unrecovered
166,000.00
Loss on second mortgage transac- tion (Eubanks) 110,000.00
Total
$528,170.00
These claimed losses emanated from four transactions: 1. Purchase of three oil drilling rigs by Sam E. Broadhead; 2. Payments made by Sam E. Broadhead on behalf of Broadhead Drilling Company; 3. Loss on a second mortgage transaction with M. *123 J. Eubanks; and 4. Advances to J. E. Stack, Jr., which petitioners claimed were worthless. Petitioners conceded at the trial that they are not entitled to the J. E. Stack loss of $140,089.52. But the other claimed losses are still in controversy. We will discuss each separately. A. Oil drilling rigs In the late 1940s Sam E. Broadhead became interested in the exploration and production of oil and gas. His first investment in this business was the acquistion of a royalty interest in the Langsdale Field located near Brewer, Mississippi. He later expanded his oil and gas activities by undertaking some drilling operations in Clarke County, Mississippi, and later in Texas. In 1961 he had an interest in 25 oil wells. Sometime around 1959 he became interested in drilling oil wells with Jack Stack. During the period of their association, which continued until December 1960, Stack and Broadhead drilled several oil wells. Initially, Stack and Broadhead has someone to drill the oil wells for them. At a subsequent date Broadhead acquired drilling rigs to drill his own wells. The first rig acquired by him was a rebuilt S-50 Bethlehem from the Bouchelle Drilling Co. He acquired a half interest *124 in the rig on October 20, 1959, for $25,000. This amount was paid by a personal check of Sam E. Broadhead on the date of acquisition. The rig was approximately 35 years old when it was acquired. In November 1961, Broadhead acquired the remaining half interest in the S-50 Bethlehem rig from M. G. Bouchelle for $10,000. Broadhead gave his personal note, dated November 27, 1961, in the amount of $10,000, payable in 12 months, to M. G. Bouchelle for the remaining half interest. This note was paid in full on November 8, 1962, by Broadhead Drilling Company by check number 3728 in the amount of $10,120, which included interest of $120. In January 1960, Broadhead acquired a used short rig known as the Brewster N-4 969 from Martin Reagan for the sum of $60,000. The $60,000 was paid by Broadhead with the exception of $6,000 which was paid by Broadhead Drilling Company by its check dated May 24, 1961, in the amount of $3,000 and its check dated June 15, 1961, in the amount of $3,000. The rig was approximately 15 or 20 years old when it was acquired. In 1960, Jack Stack and Broadhead acquired a used deep rig known as the Brewster N-75 from the Zack Brooks Drilling Company. Broadhead *125 initially acquired a half interest in the Brewster N-75 rig. Stack acquired the remaining half interest. The total purchase price was $150,000. Stack and Broadhead both executed promissory notes of $75,000 for their half of the purchase price of the rig. The monthly payments, exclusive of interest, were $2,083.33. In late 1960, Stack ran into financial difficulties and Broadhead acquired his interest for $5,000 and assumed his remaining portion of the indebtedness for the rig. In payment of the Brewster N-75 rig, Broadhead paid $99,166.64, and Broadhead Drilling Company paid $15,000. When Sam Broadhead died on February 6, 1965, the unpaid balance owing on the rig was $61,500. The executors of the estate returned the rig to Chesley Pruet Drilling Company (successors to Zack Brooks Drilling Company) for a credit of $47,250 and paid the sum of $14,250 in full settlement of the indebtedness. Broadhead deducted depreciation on the three drilling rigs acquired by him. For the year 1961, he deducted $50,000. Prior to 1961 he had deducted a total depreciation on the rigs of $30,715.66. In January 1962, Broadhead sold the Brewster N-4, Brewster N-75, and Bethlehem S-50 drilling rigs to Broadhead *126 Drilling Company, Inc. At the trial the petitioners denied that any sale of the rigs ever took place, but the petition alleges that the rigs were delivered by unrecorded bill of sale. The sale of the rigs to Broadhead Drilling Company was also reported by petitioners in their 1962 return which was reviewed and discussed with Broadhead before it was filed, and the sale was accepted by respondent as reported. The rigs were used by Broadhead Drilling Company in its drilling operations. It took out insurance on the rigs and paid the premiums on the policies. It also assumed the indebtedness owed by Sam E. Broadhead to Zack Brooks Drilling Company on the Brewster N-75 rig. For the taxable years 1962 and 1963 Broadhead Drilling Company deducted depreciation for the drilling rigs of $59,821 for each year as follows: Rig
Depreciation
S-50 Bethlehem
$ 9,936.00
Brewster N-4
10,800.00
Brewster N-75
39,085.00 Broadhead Drilling Company ceased operations in late 1964, and at that time the rigs were returned to Sam Broadhead. The rigs were listed as miscellaneous property in the estate tax return of Sam E. Broadhead. A value of $69,000 was placed on the rigs. Section *127 165 of the Code provides that in computing taxable income in the case of an individual, a deduction is limited to losses sustained during the taxable year and not compensated for by insurance or otherwise, (1) if incurred in a trade or business, (2) if incurred in any transaction entered into for profit, though not connected with a trade or business, and (3) as to property not connected with the trade or business, if the loss arises from fires, storms, shipwrect or other casualty or from theft. Even though the loss may have been of a character permitted by section 165, there are four requirements that must be met as a basis for the allowance of a loss deduction: (1) there must be an actual loss sustained; (2) the loss must be one sustained by the taxpayer; (3) the loss must be one sustained in a closed transaction during the taxable year; and (4) the loss must not be compensated for by insurance or otherwise. Petitioners must show that they have in fact sustained a loss and that such loss was sustained in the taxable year 1964. Stivers v. Commissioner, 360 F. 2d 35 (C.A. 6, 1966); Harry F. Shannon, 29 T.C. 702 (1958). The facts herein make it clear that *128 petitioners have failed to establish the requisite closed transactions during the taxable year 1964 or that an actual loss was sustained in any taxable year. Section 1.165-1(b), Income Tax Regs., provides that to demonstrate entitlement to a loss deduction, the taxpayer must show that the loss is (1) fixed by a closed transaction; (2) identified by recognized events; and (3) sustained in the year claimed. In other words, a taxpayer must show facts reflecting an identifiable event or happening which closes the tax accounting for the property and permits the final tax calculation to be made. In the absence of a sale 970 or other identifiable event, a loss may be claimed only when the property is completely worthless. The transactions with respect to the oil rigs were not closed in 1964. The rigs were owned by Broadhead at the date of his death in 1965. The Brewster N-75 rig was returned to Chesley Pruet Drilling Company on July 21, 1965. Three pieces of the Brewster N-4 rig are still in the possession of the executors of the Estate of Sam E. Broadhead. The turntable and the derrick are still owned by the Estate of Sam E. Broadhead. They are located on the farm of W. A. Combest *129 in Jasper County, Mississippi. The S-50 Bethlehem rig acquired from the Bouchelle Drilling Company was stored by the executors of the Estate of Sam E. Broadhead at Needham, Alabama. The rig was later sold for $1,500 in 1965 or some subsequent year to the uncle of Norris Broadhead. Under the circumstances the petitioners are not entitled to any loss deduction in 1964. It is equally clear that petitioners have not established that they suffered a loss in any year. The amount of loss allowable as a deduction under section 165(a) cannot exceed the amount prescribed by section 1.1011-1 of the regulations as the adjusted basis for determining the loss from the sale or other disposition of the property involved. The basis of the property must be adjusted as prescribed by section 1.1011-1 of the regulations for depreciation in order to determine the amount of loss allowable as a deduction. In arriving at the amount of loss, petitioners have the burden of establishing the adjusted basis of the rigs. Oates v. Commissioner, 316 F. 2d 56 (C.A. 8, 1963). The record shows that petitioners deducted depreciation on the rigs for 1961 and prior years of $80,716.66 and that Broadhead *130 Drilling Company deducted depreciation on the rigs of $119,642. Drill pipe on the Brewster N-4 was sold in late 1965 for $1,800, and what remained of the S-50 Bethlehem rig was sold in 1965 for $1,500. Portions of both of these rigs, value of which has not been established, were stolen. Three pieces of the Brewster N-4 rig, value of which has not been established, are still in possession of the executors of the estate. We think these facts justify the conclusion that the petitioners have failed to establish the adjusted basis of the rigs. B. Payments by Broadhead on behalf of Broadhead Drilling Company Broadhead Drilling Company, Inc., was incorporated pursuant to the laws of the State of Mississippi in late December 1960. The incorporators were the five children of Sam E. Broadhead. The stock of the corporation was owned by the three daughters and two sons of Sam E. Broadhead. Sam Broadhead did not own any stock in the corporation. He was not an officer of the corporation. Norris Broadhead was president of Broadhead Drilling Company and was concerned with operational aspects of the company. Paul Broadhead was secretary of the corporation and was concerned with administrative *131 and selling aspects of the company. Sam E. Broadhead participated in the decisions made on behalf of the corporation. During the taxable years 1961 to 1964, inclusive, Sam E. Broadhead advanced funds by check to Broadhead Drilling Company and received funds from the corporation as follows: Amount
Amount
Advanced
Received
Year
to Company
from Company
1961
$ 95,250.00
$251,607.47
1962
94,450.00
70,000.00
1963
69,685.85
23,765.60
1964 24,202.93
14,000.00
Total $283,588.78
$359,373.07 The funds which were disbursed to Sam E. Broadhead from Broadhead Drilling came from payments which customers made to the corporation for drilling operations performed for them. Over the period of four years, Broadhead received $75,784.29 more from the company than he advanced to it. During the taxable years 1961, 1963, and 1964, Sam E. Broadhead paid some operating expenses of Broadhead Drilling Company directly to its creditors. The amounts paid in each of the years are as follows: Year
Amount
1961
$ 77,980.95
1963
17,931.14
1964 111,690.24
Total $207,602.33 Since Broadhead received $75,784.29 directly from the corporation *132 over and above the amount advanced to it, the net amount was $131,818.04. The return filed by petitioners for 1964 and their petition claimed a loss of 971 only $94,000 for unrepaid portion of funds paid on behalf of Broadhead Drilling. Petitioners argue that the net amount paid on behalf of Broadhead Drilling was deductible because Broadhead Drilling was simply one of Sam Broadhead's business departments. While one of the purposes of incorporation may have been to serve the personal convenience of Sam Broadhead or its shareholders, so long as that purpose was followed by the carrying on of actual business by the corporation, the corporation remained a separate taxable entity. The doctrine of separate entity of a corporation is usually respected except "in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." New Colonial Ice Company v. Helvering, 292 U.S. 435, 442 (1934). See also Bancker v. Commissioner, 76 F. 2d 1 (C.A. 5, 1935), affirming 31 B.T.A. 14 (1934); Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943); and Skarda v. Commissioner, 250 F. 2d 429, 434 *133 (C.A. 10, 1957). This record leaves no doubt that Broadhead Drilling actively conducted business operations. The company commenced drilling oil wells in January 1961 and drilled a total of 28 wells in that year. A total of 30, 11 and one wells was drilled in 1962, 1963, and 1964, respectively. Additional facts show that Broadhead Drilling was a viable corporate entity. It opened and maintained a bank account in its corporate name. Books of account were set up for the corporation and Mrs. S. A. Meacham was hired to keep those books. The company was sued in its corporate name in Mississippi State court on at least two occasions. Employees were hired to drill the wells and payroll records were maintained. The corporation secured an employer's identification number and filed Federal income tax returns. In addition, Sam Broadhead and his sons treated Broadhead Drilling as a bona fide corporation in their dealing with third parties and creditors. Therefore, Broadhead Drilling was distinct from Sam Broadhead or its stockholders and must be regarded as a separate taxable entity. See Planters' Cotton Oil Co. v. Hopkins, 53 F. 2d 825 (C.A. 5, 1931), affirmed 286 U.S. 332 (1932). *134 In their briefs petitioners rely only on the provisions of section 165 of the Code. To come within the purview of section 165, petitioners must demonstrate that their loss was incurred in the conduct of a "trade or business" or in a "transaction entered into for profit." The Internal Revenue Code does not by a specific definitional section or by inference in any substantive section provide a precise definition of what constitutes a trade or business. The Supreme Court has indicated a narrow construction of the term "trade or business," suggesting that the term includes only those situations where the taxpayer holds himself out to others as engaged in the sale of goods or services. Deputy v. DuPont, 308 U.S. 488, 499 (1940). Whether a particular loss is incurred in a taxpayer's trade or business is a question of fact in each case. Higgins v. Commissioner, 312 U.S. 212 (1941). What "trade or business" was being conducted by Broadhead during the taxable years 1961 through 1964? He was not individually engaged in the oil drilling business. The record establishes that during the operation of Broadhead Drilling Company, Sam Broadhead did not drill any wells *135 in his individual capacity. The record also establishes that Sam Broadhead and his sons treated Broadhead Drilling as a bona fide corporation in their dealings with third parties and creditors. The payments made by Broadhead to creditors of Broadhead Drilling were not payments incurred in any business of Sam Broadhead. He owned no stock in Broadhead Drilling and that business cannot be construed to be his business. By the same token, Broadhead Drilling's losses were not his losses. A fair inference to be drawn from these facts and from this record as a whole is that the oil drilling business was carried on by the corporation, not Sam Broadhead, during the years 1961 through 1964. Whether from honest bias or determined obfuscation, the petitioners have tried, albeit unsuccessfully, to make their evidence fit a bed of Procrustes in an attempt to shed the corporation. We are unable to cause the realities to disappear and find, as petitioners would have us do, that the corporation vanished during these years and that he conducted the oil drilling business on his own. In our judgment the petitioners have failed to bring themselves within the provisions of section 165. The payments were *136 not in satisfaction of any liability incurred by Broadhead. The expenses were those of Broadhead Drilling Company and payment by Sam Broadhead was purely 972 voluntary and made without consideration. He was under no obligation to pay the expenses of the corporation. It is well established that a payment made without consideration, a gift or voluntary contribution, can in no way supply the basis for the deduction of the amount so paid or contributed as a loss incurred in a trade or business or in a transaction entered into for profit. A. Giurlani & Bro., 41 B.T.A. 403 (1940), affirmed 119 F. 2d 852 (C.A. 9, 1941). Accordingly, we hold that the petitioners have failed to establish that they are entitled to any deduction for amounts paid on behalf of Broadhead Drilling Company. Cf. United States v. Generes, 405 U.S. 93 (1972). C. The Eubanks transaction In 1964 Sam E. Broadhead loaned a sum of money to M. J. Eubanks, who gave a deed of trust on a residence and 75 acres of land in Lumberton, Mississippi. When the deed was filed, Broadhead discovered that there was already a deed of trust on record which constituted a lien prior to the *137 deed of trust which M. J. Eubanks had given him. Foreclosure proceedings resulted and Broadhead purchased the residence at the foreclosure sale. The total cost to Broadhead for the property, including the amount of the deed of trust held by him, was $110,000. The residence and land were sold in 1966 by the executors of the Estate of Sam E. Broadhead for $65,000. It is well settled that losses sought to be deducted for income tax purposes must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable period for which allowance is claimed. Harry F. Shannon, supra; and section 1.165-1(b), Income Tax Regs. No deduction is allowable for a mere decline, diminution or shrinkage in value. Reporter Publishing Co., 18 T.C. 86 (1952), affirmed 201 F. 2d 743 (C.A. 10, 1953), certiorari denied 345 U.S. 993 (1953). The facts here are similar to those in George C. Beidleman, 7 B.T.A. 899 (1927), wherein the taxpayer purchased in 1919 what he thought was a fee simple title to 80 acres of land. In 1920, as a result of an action to quiet title to the land in question, *138 it was decreed that he was the owner of only an undivided oneseventh interest therein. It was held that no gain or loss was sustained on the transaction until it was closed by sale or other disposition. Since petitioners continued to own the residence and land until 1966, there was no closed transaction for tax purposes in 1964. There was a diminution in value in 1964, but that did not trigger the allowance of any deductible loss. It is clear that a $45,000 loss was actually sustained and that such amount is allowable in 1966 and not 1964 as claimed by the petitioners. 7. Basis to be used in computing gain on Avoyelles, Togo Island and Sturgis properties. The notice of deficiency for the taxable year 1963 was issued on January 14, 1966. At that time the prior cases were pending before this Court. One of the issues presented in those cases was the fair market value on repossession of the Avoyelles and Togo Island properties. Respondent contended in those cases that the fair market value of the Avoyelles property on repossession was $629,900 and that the fair market value of Togo Island property on repossession was $269,600. The Avoyelles and Togo Island properties were resold *139 in 1963. In computing gain or loss, the respondent used a basis consistent with this determination in the prior cases. In determining gain from the Avoyelles property in 1963, a basis of $629,900 was used in the statutory notice. In 1961 Togo Island and certain Arkansas property were sold to Ark Investments, Inc., and repossessed prior to the sale of Togo Island to McGill Realty Company in 1963. Accordingly, the sale and repossession of Togo Island in 1961 was taken into consideration in arriving at a basis to be used for the sale of Togo Island in 1963. On January 28, 1966, two weeks after the notice of deficiency was issued for 1963, the Court rendered its opinion in the prior cases. Estate of Sam E. Broadhead, supra. In the prior opinion we determined that the fair market value of Togo Island on repossession was $121,000 and the fair market value of the Avoyelles property on repossession was $400,000. These amounts represented the amounts bid on these properties by petitioners at the foreclosure sales. The notice of deficiency for 1964 and 1965 determined a basis for the Avoyelles property of $401,820 and the gain was computed accordingly. This basis was based *140 on the prior opinion and the gain on the sale for 1963 should be recomputed to 973 reflect gain consistent with the prior opinion of this Court. The notice of deficiency for 1964 and 1965 also determined a basis for the Togo Island propery consistent with the prior opinion and the sale of Togo Island in 1961 and subsequent repossession which was recognized in the statutory notice for 1961. However, the answer was subsequently amended for the year 1961 to take into account the fair market value of the Togo Island and Arkansas property on repossession as determined in the prior opinion. The basis should be computed consistently with the prior opinion and the opinion rendered in the instant cases. In 1963 petitioners sold 40 acres of the Sturgis property for $1,000 and claimed a basis on their return of $300. Respondent determined that the basis was $260 in lieu of $300 and increased the gain by $40. Petitioners offered no evidence to support the $300 basis claimed on their return. Accordingly, we sustain respondent's determination. 8. Section 6653(a) addition to tax for 1964. In his notice of deficiency for the taxable year 1964 the respondent determined that a part of the *141 deficiency was due to negligence, as provided by section 6653(a) of the Code. This determination is presumptively correct and places the burden upon the petitioners to prove that the imposition of the addition to the tax is erroneous. Leroy Jewelry Co., 36 T.C. 443 (1961); David Courtney, 28 T.C. 658 (1957). No evidence was presented by petitioners to justify any finding that the addition for negligence was not applicable. Petitioners conceded by stipulation that several items representing substantial amounts were improperly deducted on their return. The evidence further supports the conclusion that petitioners had no basis to deduct business losses of $528,170 in 1964. Petitioners admitted at the trial that they could not sustain the losses to the extent deducted on the return and conceded that the Jack Stack loss deducted in the approximate amount of $140,000 was unsupportable. Under the circumstances we think the petitioners failed to exercise reasonable care in assuring that their return properly reflected income and deductions. Accordingly, we hold that the petitioners have failed to meet their burden of proof and are liable for the addition to tax *142 for the year 1964. Robert L. Bunnel, 50 T.C. 837, 843 (1968). 9. Understatement of capital gains for 1964. In his notice of deficiency the respondent increased petitioners' taxable income from capital gains and losses by $11,761.62 for the year 1964. Some adjustments were made by the respondent to several capital gain transactions, and the petitioners have offered no evidence to dispute the adjustments. In addition, the adjustments included increases in the Avoyelles and Togo Island properties. Since we have held that these sales resulted in ordinary income rather than capital gains, the collections in 1964 would also constitute ordinary income. There are also adjustments to be made in the computation of the basis of the Togo Island property and in connection with the Merchants & Farmers Bank transaction. Consequently, the correct amount of any understatement of petitioners' capital gain income for 1964 can be determined in the Rule 50 computations. 10. Claimed deduction in 1965 for payment of debts of Broadhead Drilling Company. For the year 1965 the petitioners claimed a deduction for oil operations expense in the amount of $6,813.74. The deduction consisted of *143 the following payments which were disallowed by the respondent: Payee
Amount
The Southland Company
$5,755.78
Henry Gordon
100.00
Chance Sales and Service
957.96 The disallowed amount was paid on behalf of Broadhead Drilling Company and incurred in the operation of its oil well drilling business. What we have said herein with respect to the claimed business losses (Issue 6B) applies here. Suffice it to say that the expenses were those of the Broadhead Drilling Company and not those of the petitioners. In any event, the petitioners have failed to establish that the $5,755.78 check to The Southland Company was paid in 1965 rather than 1964. 11. Section 6651(a) addition to tax for 1965. The petitioners' Federal income tax return for the year 1965 was filed with the Southeast Service Center, Chamblee, Georgia, on November 16, 1966. An extension in which to file the return was granted to October 15, 1966. The return was one month and one day late so that the asserted addition to tax is 10 percent. We must decide whether the failure to file the return on time was due to reasonable cause and 974 not to willful neglect. The burden of establishing reasonable *144 cause falls on the petitioner. William M. Bebb, 36 T.C. 170 (1961); section 301.6651-1(c), Procedure and Administration Regulations. The return was forwarded for filing with the Southeast Service Center with a lengthy letter dated November 14, 1966. In summary the letter stated that the return was filed late for three reasons: (1) State law dealing with trusts and estates required reconciling of accounts and advice from an attorney, (2) a court order was necessary for everything that was done, and (3) court litigation consumed time of the executors-trustees. Although the issue is close, we are satisfied that the executors of Sam Broadhead's estate and Mrs. Broadhead exercised ordinary business care and prudence as required by the statute and regulations in ordep to justify a finding by this Court of reasonable cause for filing the return late. Therefore, we conclude that the petitioners are not liable for the addition to tax under section 6651(a) for the year 1965. 12. Section 6653(a) addition to tax against Paul E. and Sherry Broadhead. In his notice of deficiency sent to Paul E. and Sherry Broadhead the respondent determined that a part of the underpayment was *145 due to negligence, as provided by section 6653(a) of the Code. The determination is presumptively correct and the Broadheads have the burden of proving that the imposition of the addition to tax is erroneous. David Courtney, supra.
No evidence was presented to justify any finding that the addition to tax for negligence is not applicable. Concessions made by the Broadheads show that they failed to use reasonable care in assuring that their return properly reflected income and deductions. Accordingly, we hold that they have failed to meet their burden of proof and are liable for the addition to tax. Robert L. Bunnel, supra at 843. 13. Deduction of $80,172.67 for claimed contribution to the Sam Broadhead Foundation. On April 17, 1972, respondent filed in Docket No. 1340-68 a motion for leave to file an amendment to his answer to conform the pleadings to the proof. Respondent's notice of deficiency for the taxable year 1964 allowed a contributions deduction of $80,172.67 to the petitioners on the belief that Sam E. Broadhead had made a gift of stock of the Lamar Hotel Corporation with a fair market value of $300,000 to the Sam Broadhead Foundation in 1964. *146 Prior to the trial of these cases facts developed which indicated to respondent that there had been no completed gift of the stock in 1964. On two previous occasions the Court denied respondent's motions for leave to amend his answer. In the related cases, Docket Nos. 844-68 and 3710-69, which were presented separately for trial to the Court, the petitioners offered the testimony of two witnesses with respect to facts having a bearing on this issue. The testimony of the Honorable William Neville, Chancellor of the 12th Judicial District of Mississippi, and Paul Broadhead establishes that there was no delivery of the shares of the Lamar Hotel Corporation stock to the Sam Broadhead Foundation in 1964. Petitioners requested that facts presented in Docket Nos. 844-68 and 3710-69 be considered by the Court in the instant cases. The request was granted. Hence the testimony of William Neville and Paul Broadhead is a part of the record in these cases. Commissioner v. Finley, 265 F. 2d 885 (C.A. 10, 1959), affirming a Memorandum Opinion of this Court. In Docket Nos. 844-68 and 3710-69 we concluded that Sam E. Broadhead did not make a completed gift of the Lamar Hotel Corporation *147 stock to the Sam Broadhead Foundation in 1964. Therefore, we will now grant the respondent's motion for leave to amend his answer in Docket No. 1340-68 in order to conform the pleadings to the proof. To reflect the concessions made by the parties and our conclusions with respect to the disputed issues, Decisions in all dockets will be entered under Rule 50. 975 Footnotes
1. The proceedings of the following petitioners are consolicated herewith: Estate of Sam E. Broadhead, Deceased, by: S. Norris Broadhead and Paul E. Broadhead, Executors, and Virdie Cox Broadhead, docket No. 1836-66; Estate of Sam E. Broadhead, Deceased, by: S. Norris Broadhead and Paul E. Broadhead, Co-Executors, and Virdie Cox Broadhead, docket No. 1340-68; and Paul E. and Sherry Broadhead, docket No. 728-68.↩
2. Section 6651(a), Internal Revenue Code of 1954↩. All statutory references herein are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. 3. Section 6653(a).↩
4. The use of the term "petitioners" herein does not include Paul and Sherry Broadhead.↩